UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VAUGHN MITCHELL,

                    Petitioner,                    Case No.: 15-cv-10356
                                                   Honorable Linda V. Parker
v.

DUNCAN MACLAREN,

                    Respondent.

_____/


**OPINION AND ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS AND GRANTING IN PART THE
CERTIFICATE OF APPEALABILITY**

Vaughn Mitchell ("Petitioner") confined at the Kinross Correctional Facility

in Kincheloe, Michigan, through counsel, filed a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254. Mitchell challenges his convictions for first-

degree felony murder, first-degree premeditated murder, carjacking, and

possession of a firearm during the commission of a felony. For the reasons stated

below, the petition for a writ of habeas corpus is denied.

I.    **Background**

Mitchell's convictions arise from a shooting in Detroit that resulted in the

death of Michael Jorden. The Michigan Court of Appeals described the

circumstances leading to Mitchell's convictions as follows:

Defendant's convictions arose out of the June 21, 2008, shooting death of Michael Jorden during an apparent dispute over a gun and associated carjacking. Defendant was tried jointly with his father, codefendant Vaughn Brown, before separate juries. Brown was not a part of defendant's life growing up, and they had a strained relationship. They had reconnected a few years before the shooting.

At the joint trial, Ellis Odum testified that he lived across the street from defendant. On the evening of the shooting, Odum saw several young people socializing on the street, including the victim and defendant. Brown was sitting in his van, which was parked on the street. Brown's brother testified that the rear window of the van was darkly tinted and one could not see through it at night. Odum testified that later that night, when he went inside his house, he heard approximately six gunshots. When it became quiet, Odum went outside and saw someone "moving from the field [vacant lot] and coming down toward the street light." Odum eventually recognized the person as defendant. In defendant's hand was a .32 or .38 short-barrel revolver, which he then placed in his pocket. When Odum asked him what was going on, defendant said, "sh-h-h, it's me." Defendant then crossed the street and entered the passenger side of Brown's van. Odum continued:

> Upon getting into the passenger side of his father's vehicle, I'm watching, then I conversate, he pulls up to in front of my house, no headlights. Upon pulling up in front of my house, I can hear—we both heard—you can hear noise coming from the left. At that point in time, they cut out their headlights. I look, you can see the [victim's] body, like, near the curb, you see him coming toward the curb. He pulled right to him, to the side of him, and he reached out of the driver's side and shot him about 5 times.

Odum explained that Brown was in the driver's seat and defendant was in the passenger seat. The driver's side of the van pulled up alongside the victim's body, which was on Odum's side of the street. Odum believed that Brown reached out of the van and shot the victim. He could not determine the type of gun in Brown's hand. After

"firing shots into him, they went to go speed off, and they got to the corner, and he stopped, and [defendant] got out, he ran back to his body." Defendant had a gun. He looked around, took the contents of the victim's pockets, "ran across the street and jumped and got into the [victim's] vehicle and drove off in the vehicle."

Odum testified that he was aware the victim owned a revolver like the one he saw in defendant's hand. Approximately a week before the shooting, defendant had the victim's gun and showed it to Odum. The victim wanted his gun back or $150. Odum believed that defendant had agreed to pay and that Brown was bringing defendant the money.

Detective Sergeant William Tyrrell, a firearms examiner with the State Police Crime Laboratory, testified at trial as a ballistics expert. Two bullets were recovered from the victim's body. Detective Sergeant Tyrrell concluded, based on the rifling of the bullets, that the bullets were fired by two different weapons. The diameter of the bullets indicated that the weapons were a nine millimeter, a 357, or a 38 special. There were no weapons to examine.

Detective Dale Collins interviewed defendant after his arrest. The videotaped interview was admitted at the joint trial and played for defendant's jury.[1] During the interview, defendant stated that in March or April 2008, he owned a Smith & Wesson long-nosed 38 special handgun, and that he and the victim had "done some bullshit together." Defendant asked the victim to keep his gun because he did not want it in his vehicle. When defendant asked for the gun to be returned, the victim offered an excuse for not having it. Sometime later, the victim came across a different .38–caliber gun and gave it to his brother Mark, who had apparently partnered with defendant to sell marijuana. Mark then gave the gun to defendant. A few days later, the victim asked for the gun, but defendant refused. Later, when the victim again asked for the gun, defendant asked the victim for his own gun in return.

[1]The videotape was not played for Brown's jury.

According to defendant, the victim had promised Brown[2] the gun in defendant's possession as payment for a debt. On the day of the shooting, when Brown asked defendant for the gun, defendant said the

victim no longer had a gun to give. Brown called the victim. That night, defendant was outside with a group of people, and had the gun on him, when the victim drove up demanding the gun. Defendant told the victim to "chalk that up baby—tit for a tat—where mine at." The victim disagreed and demanded $150 for his gun. Defendant walked away and explained the situation to Brown. He and Brown went to the store together, and Brown suggested that defendant fight the victim. Defendant said he "don't really know how to fight for fun" and "[i]f I get into a fist fight one of us have to go." Brown then suggested that defendant hit the victim in the knees with a club or a bat to let him know that he was serious. Defendant planned to beat the victim with an old tie rod.

> [2] During the interview, defendant declined to identify Brown, referring to him as John Doe.

When defendant and Brown returned from the store, they parked further down the street. The victim approached Brown's van and again demanded money or his gun. Defendant stepped out of the van, leaving the gun inside. When the victim reached for the gun, defendant hit him with the tie rod and hit him again as he was trying to run away. The victim ran toward a vacant lot, "leaking out of his head," and his pants fell down as he was running. Defendant ran after him because he believed that the victim was going to retrieve his AK–47, and defendant began "beating this muthafucka brains in with this gun." At that point, the victim was on the ground, near the curb.

After the beating, defendant looked through the victim's pockets and took "maybe ten dollars." He then walked back to Brown's van, still holding the gun. He entered the van, and they "pulled up the street." Defendant "heard some shots fired" and then jumped out of the van. He denied shooting the victim and taking the victim's keys or car. He did not know who took the car.

At the joint trial, defendant testified on his own behalf, admitting the truth of most of his statement to the police. He admitted beating the victim, but denied shooting him or taking his car. Defendant testified that Brown shot the victim. According to defendant, after he beat the victim and entered Brown's van, Brown drove to where the victim

was lying and shot him several times. Defendant jumped out of the van and ran away.

Brown testified [before both his and Mitchell's juries] that he did not know the victim. On the night of the shooting, defendant called him. He believed that defendant was going to ask him for money, so he drove his van to the street where defendant lived. Defendant approached the van and asked whether you are "even" with another person if the other person loses something of yours and you tell them that you lost something of theirs. Later, defendant spoke to the victim next to the van and Brown overheard the victim say that he wanted money for his "piece." Defendant then grabbed an item from the floor of the van and started chasing the victim, hitting him with the item. Defendant then shot the victim five times. Brown drove his van slowly up the street. He saw the victim on the ground and defendant running toward the van, flagging him down. Defendant got in the van. But when Brown began driving, defendant asked him to pull over to the other side of the street and stop. Defendant then leaned across Brown, reached out the driver's window, and shot the victim five more times, holding the gun with both hands. Brown drove around the corner, stopped, and then defendant jumped out and disappeared.

Brown's jury was unable to reach a verdict, and he was later retried and acquitted. Defendant was convicted and sentenced as indicated.

*People v. Mitchell*, No. 293284, 2011 WL 5064301, at *1-3 (Mich. Ct. App. Oct. 25, 2011).

After Mitchell's arrest, he participated in a videotaped interview concerning the shooting with Detroit Police Detective Dale Collins. Defense counsel filed a pre-trial motion to suppress Mitchell's custodial statements. The trial court denied the motion. (ECF No. 10-4 at Pg ID 408-413.) Following a jury trial in Wayne County Circuit Court, Petitioner was convicted and sentenced as follows: two concurrent terms of life imprisonment for each murder conviction, 15 to 25 years'

imprisonment for the carjacking conviction, and two years' imprisonment for the felony-firearm conviction.

Mitchell filed an appeal of right in the Michigan Court of Appeals, raising the following claims: (i) Mitchell's custodial statement should have been suppressed because Mitchell's right to have an attorney present before and during questioning was not made clear to him; (ii) mid-stream *Miranda* warnings violated Mitchell's rights to remain silent and to an attorney; (iii) Mitchell's jury should not have been allowed to hear testimony of co-defendant; (iv) bullets should have been excluded from evidence because a chain of custody was not properly established; (v) prosecutor engaged in several instances of misconduct; (vi) newly-discovered evidence showed that a police sergeant committed perjury regarding the chain of custody of the bullets; (vii) jury instructions failed to convey necessary intent element; (viii) defense counsel was ineffective and a *Ginther* hearing should be ordered; (ix) cumulative effect of alleged errors denied Mitchell a fair trial; and (x) convictions for first-degree premeditated murder and first-degree felony murder of one victim violated double jeopardy. The Michigan Court of Appeals denied relief on Petitioner's claim that the prosecutor failed to establish a proper chain of custody for the bullets. The court remanded the case for an evidentiary hearing "regarding defendant's interaction with the police and the totality of circumstances surrounding the police's interrogation of defendant" and the claim that a police

sergeant gave perjured testimony regarding the chain of custody of the bullets. *Mitchell*, 2011 WL 5064301, at \*13. The Michigan Court of Appeals declined to address the additional issues raised by Mitchell until after proceedings on remand were completed. *Id.*

The State appealed the decision to the Michigan Supreme Court. The Michigan Supreme Court reversed the court of appeals' grant of a remand and found no *Miranda* violation. *People v. Mitchell*, 822 N.W. 2d 224, 224 (Mich. 2012). The court also remanded the case to the court of appeals to address the claims it previously declined to review. *Id.* at 225. On remand, the Michigan Court of Appeals denied Petitioner's remaining claims, with the exception of his double jeopardy claim. *People v. Mitchell*, No. 293284, 2013 WL 951192, at \*7 (Mich. Ct. App. Feb. 26, 2013). The Michigan Court of Appeals held that Mitchell's convictions and sentences for first-degree premeditated murder and first-degree felony murder arising out of the death of a single victim violated the Fifth Amendment Double Jeopardy Clause. *Id.* The court of appeals remanded the case for modification of the Judgment of Sentence to reflect a single conviction and sentence for first-degree murder supported by two different theories. *Id.*

Mitchell, through counsel, then filed this habeas corpus petition. He raises these claims:

I. The Michigan courts unreasonably applied clearly established federal law and unreasonably determined the facts in upholding

Mr. Mitchell's convictions where the prosecution was permitted to offer evidence that Mr. Mitchell had made incriminating statements after he had invoked his right to counsel, where Mr. Mitchell asked the interrogating officer if an attorney could be appointed to be with him during questioning, and the officer affirmatively told him that an attorney would only be appointed for him "down the line," when the case went to court, thereby failing to reasonably convey to Mr. Mitchell his right to have an attorney present both before and during questioning; thus necessitating the issuance of the writ.

II.     The Michigan courts unreasonably applied clearly established federal law and unreasonably determined the facts in upholding Mr. Mitchell's convictions where the prosecution was permitted to offer evidence that Mr. Mitchell had made incriminating statements which were intentionally elicited from him following an earlier un-*Mirandized* interrogation during which Mr. Mitchell made incriminating statements, and which took place prior to taking Mr. Mitchell to a room where a video camera recorded the communication of purported *Miranda* warnings and a lengthy interrogation, and where this "mid-stream" recitation of the *Miranda* warnings violated Mr. Mitchell's rights to remain silent and his right to counsel; thus necessitating the issuance of the writ.

III.    The Michigan courts unreasonably applied clearly established federal law and unreasonably determined the facts in upholding Mr. Mitchell's convictions where the trial court erroneously instructed the jury that it could convict Mr. Mitchell of first-degree premeditated murder if it found that his co-defendant intended to kill the decedent and also committed the acts that resulted in death, which failure deprived the defendant of his right to a properly instructed jury and his right to a fair trial; thus necessitating the issuance of the writ.

IV.    The Michigan courts unreasonably applied clearly established federal law and unreasonably determined the facts in upholding Mr. Mitchell's convictions where the trial prosecutor deprived Mr. Mitchell of his federal constitution[al]

rights to due process and a fair trial under U.S. Const. Ams. V, XIV, with severe, outcome-determinative misconduct.

V. This Court should preside over an evidentiary hearing where the Michigan courts unreasonably applied clearly established federal law and unreasonably determined the facts in upholding Mr. Mitchell's convictions where his trial counsel failed to request an evidentiary hearing regarding his un-*Mirandized* interrogation; failed to object to prosecutorial misconduct; and failed to object to a serious instructional error, which failures constituted a deficient performance which deprived Mr. Mitchell of a fair trial.

VI. The Michigan courts unreasonably applied clearly established Federal law and unreasonably determined the facts in upholding Mr. Mitchell's convictions where, the state courts failed to fi[n]d that, even if no single assignment of error is sufficient for reversal, the totality of trial errors denied Mr. Mitchell a fair trial.

VII. Assuming *arguendo* that the standard of review set forth in 28 USC § 2254([d])(1) precludes relief in this action, the Court should not apply that standard because it is unconstitutional.

## II.    Standard

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,

imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring). An "unreasonable application" asks the question of whether the application of clearly established federal law is objectively reasonable. *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.

Pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Although § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, a federal court may grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. *Id.* Moreover, for claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.  Discussion

### A.  Evidentiary Hearing

Mitchell seeks an evidentiary hearing on his claims that his custodial statement should have been suppressed and that his trial attorney was ineffective. The Court finds that Mitchell is not entitled to an evidentiary hearing because the state court decided these claims on the merits.

In *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Supreme Court held that a federal court's review of a state court decision "[u]nder § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" because the federal habeas scheme was designed to leave "primary responsibility with the state courts." *Id.* at 181-82.  Consequently, "[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." *Id.* at 182.  Put simply, "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.*  Where, as here, a state court has issued a decision on the merits, "district courts are precluded from conducting evidentiary hearings to supplement existing state court records." *Ballinger v. Prelesnik*, 709 F. 3d 558, 561 (6th Cir. 2013).

**B.     Claims I & II:  Admission of Petitioner's Custodial Statement**

Following his arrest, Mitchell gave a statement to police confessing to being at the scene of the murder, beating the victim, and taking some money and drugs from the victim's pocket, but denying shooting the victim or taking his vehicle. Defense counsel filed a pretrial motion to suppress the statement, which was denied.  This statement was videotaped and played for Mitchell's jury.  A transcript of the interview was also admitted into evidence.  Mitchell's first two claims for relief center on the admission of this statement.  He argues that the statement should have been suppressed because it was tainted by misleading advice from the interrogating officer concerning Mitchell's right to the appointment of counsel.  He also argues that the statement should have been suppressed because of a previous interrogation that occurred before police advised Mitchell of his constitutional rights.  Mitchell makes reference in his first point heading to a claim that his incriminating statements came after he invoked his right to counsel.  He does not reference or support this claim anywhere else in the petition or brief in support.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F. 3d 989, 995-96 (6th Cir. 1997) (alteration in original) (quoting *Citizens Awareness Network, Inc. v. U.S.*

*Nuclear Regulatory Comm'n*, 59 F. 3d 284, 293-94 (1st Cir. 1995)).  This claim is waived.

### 1. State Court Proceedings

On September 10, 2008, Detective Dale Collins interviewed Mitchell about the shooting death of Michael Jorden.  Mitchell gave a videotaped statement admitting to beating Jorden, but denying shooting him or taking his vehicle.  This was not the first conversation between Mitchell and Collins.  Respondent argues that it was the second.  Mitchell maintains that he was interrogated three times and only advised of his *Miranda* rights before the third, videotaped interrogation.

Detective Collins testified that the un-taped conversation lasted approximately five minutes and that he informed Mitchell during that conversation that he knew Mitchell had been involved in a homicide and that there was an eyewitness to the shooting.  (ECF No. 10-10 at Pg ID 937.)  During this pre-*Miranda* conversation, Detective Collins asked Mitchell if he had any involvement in the homicide.  (*Id.*)  Detective Collins testified that, "when [Mitchell] started talking about that he had some involvement, that's when I took him upstairs and gave him his Constitutional Rights."  (*Id.*)

Mitchell claims that three interviews occurred in total.  He claims that he was arrested on September 9, 2008 and detained overnight.  The next day, Detective Collins interrogated him for approximately thirty minutes, without

advising him of his *Miranda* rights. *Mitchell*, 2011 WL 5064301, at *7; (ECF No.
1-2 at Pg ID 167-68.)  During that interrogation, Mitchell denied any knowledge of
the shooting.  (ECF No. 1-2 at Pg ID 168.)  According to Mitchell, later that same
day, Detective Collins again interrogated Mitchell and attempted to solicit
information by telling Mitchell that police now had enough information to charge
him with first-degree premeditated murder.  (*Id.*)  Mitchell also claims not to have
been informed of his *Miranda* rights prior to this interrogation.  (*Id.*)   He initially
denied any knowledge of the incident, but then admitted "there was an incident
about a gun" before the day of the shooting.  (*Id.* at 169.)  He also admitted that he
was on the street with a group of people just before the shooting.  (*Id.* at 169-70.)
In response to further questions from Detective Collins, Mitchell said he would tell
Detective Collins the whole story, from the beginning.  (*Id.* at 170.)  At that point,
Detective Collins took Mitchell to an interrogation room and advised him of his
*Miranda* rights.  (*Id.*)

The videotape shows Mitchell receiving, reading, and signing the
Constitutional Rights Certificate of Notification.  The Certificate of Notification
provided, in part:

> 1.     I have a right to remain silent and that I do not have to
> answer any questions put to me or make any statements.

> 2.     Any statement I make or anything I say will be used
> against me in a Court of Law.

3. I have the right to have an attorney (lawyer) present before and during the time I answer any questions or make any statement.

4. If I cannot afford an attorney (lawyer) one will be appointed for me without cost by the Court prior to any questioning.

5. I can decide at any time to exercise my rights and not answer any questions or make any statement.

(ECF No. 1-2 at Pg ID 163.)

The videotape and transcript (both of which were admitted at trial) show that

the following exchange occurred between Detective Collins and Mitchell while

Mitchell reviewed the form:

Collins: Okay, Vaughn, I'm going to give you your Constitutional Rights. . . . I need you to read the first right out loud.

Mitchell: I understand that I have the right to remain silent and that I do not have to answer any questions put to me or make any statements.

Collins: You can read the rest to yourself. Do you understand that?

Mitchell: I ought to just read #1 again.

(10 minute pause. Mr. Mitchell reading his rights)

Collins: Do you understand – did you finish?

Mitchell: Uh, I do have a question. Number 4, that's not speaking currently – right now?

Collins: Well the question speaks for itself. If I cannot afford an attorney – you probably can – one will be appointed to
me    without cost by the court. That means down the line.

| | |
|---|---|
| Mitchell: | Meaning when the court … |
| Collins: | Right-right-right.  Did you get to the next one? |
| Mitchell: | Yeah, I read five. |
| Collins: | Okay, now read that part right there. |
| Mitchell: | Out loud? |
| Collins: | Yeah, you can read it aloud. |
| Mitchell: | I understand that these are my rights under the law, I have not been threatened or promised anything.  I desire or [sic] to answer any questions put to me at this time. |
| Collins: | Do you understand? |
| Mitchell: | Yeah, I understand. |
| Collins: | Okay, I want you to put your initials by 1, 2, 3, 4, 5 right there. |
| Mitchell: | You say by 1, 2, 3, 4, and 5? |
| Collins: | Yeah, put your initials – that means you understand your rights as far as I'm concerned.  It's just a formality. |

(ECF No. 10-15 at Pg ID 1441-42.)

Defense counsel filed a pretrial motion to suppress the videotaped statement on these grounds: Mitchell was not properly informed of his *Miranda* rights; he did not waive his *Miranda* rights; any waiver was not valid; and police continued questioning Mitchell after he invoked is right to silence and to counsel.  The trial court reviewed the videotape and found the exchange between Detective Collins

and Mitchell regarding Mitchell's right to counsel troubling, but found the warnings sufficient to convey the protections articulated in *Miranda*. (ECF No. 10-4 at Pg ID 6.)

On direct review, Mitchell argued that the videotaped statement should have been suppressed both because Detective Collins gave misleading advice concerning his right to counsel and because he was subjected to a previous interrogation without being advised of his rights. The Michigan Court of Appeals held that the mid-interrogation *Miranda* warning claim was not preserved for review because this argument was not raised in the trial court and, therefore, was reviewable only for plain error that affected his substantial rights. *Mitchell*, 2011 WL 5064301, at *3-4. The court of appeals held that it was clear that Mitchell engaged in one or more pre-*Miranda* discussions with Detective Collins. *Id.* at *8. However, the court of appeals also held that "because the facts surrounding their discussions and the specific content of the discussions are not entirely clear, and defendant's affidavit is not a part of the record, a remand for an evidentiary hearing is warranted." *Id.*[1] The court of appeals also found the record insufficient to evaluate Mitchell's claim that Detective Collins gave misleading advice regarding his right to counsel. *Id.* at *10. The court, therefore, held that on remand the trial

---

[1] The court of appeals held that the affidavit was not part of the appellate record because it was not part of the trial court record. *Id.* at 8; *see also People v. Williams*, 616 N.W. 2d 710, 713 n.1 (Mich. Ct. App. 2000) ("[P]arties cannot enlarge the record on appeal by the use of affidavits.").

court should make a factual finding regarding the circumstances surrounding the police interrogation of Mitchell. *Id.* at *13.

The Michigan Supreme Court reversed the court of appeals' decision on these claims, stating, in relevant part:

> The trial court did not err in denying defendant's motion to suppress his confession. "[U]nlike in [*Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004)], there is no concern here that police gave [defendant] *Miranda* warnings then led him to repeat an earlier murder confession, because there was no earlier confession to repeat." *Bobby v. Dixon*, --- U.S. ---, 132 S. Ct. 26, 31, 181 L. Ed. 2d 328 (2011). In addition, "*Miranda* does not require that attorneys be producible on call, but only that the suspect be informed, as here, that he has the right to an attorney before and during questioning, and that an attorney would be appointed for him if he could not afford one." *Duckworth v. Egan*, 492 U.S. 195, 198, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989).

*Mitchell*, 822 N.W. 2d at 224-25.

### 2. Right to the Appointment of Counsel Before and During Interrogation

Mitchell asserts that his statement should have been suppressed because his *Miranda* advisement was inadequate where Detective Collins told him an attorney would be appointed "down the line" if he could not afford one. The Court finds that the Michigan Supreme Court's decision that the *Miranda* warnings, considered as a whole, adequately advised him of his rights, was not contrary to or an unreasonable application of Supreme Court precedent.

A *Miranda* warning need not be "a virtual incantation of the precise language contained in the *Miranda* opinion." *California v. Prysock*, 453 U.S. 355, 355 (1981). Courts "need not examine *Miranda* warnings as if construing a will or the terms of an easement." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). Instead, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Id.* (alterations in original) (quoting *Prysock*, 453 U.S. at 361).

In *Prysock*, the suspect was advised: "you have the right to talk to a lawyer before you are questioned, have him present with you while you are being questioned, and all during questioning." *Prysock*, 453 U.S. at 356. He was also advised that he had the "right to have a lawyer appointed to represent you at no cost to yourself." *Id.* at 357. On direct appeal in state court, the defendant argued and the state court of appeals agreed that the advisement of rights was inadequate because he was not specifically informed of his right to have an attorney *appointed* before questioning. *Id.* at 358. The Supreme Court reversed, first noting that "[o]ther courts considering the precise question presented by this case—whether a criminal defendant was adequately informed of his right to the presence of appointed counsel prior to and during interrogation—have not required a verbatim recital of the words of the *Miranda* opinion but rather have examined the warnings given to determine if the reference to the right to appointed counsel was linked

with some future point in time after the police interrogation." *Id.* at 360. The Court held that the warnings given to the defendant were adequate because "nothing in the warnings . . . suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right 'to a lawyer before you are questioned, . . . while you are being questioned, and all during the questioning.'" *Id.* at 360-61.

In *Duckworth*, the Supreme Court again considered whether a suspect was adequately informed of his right to counsel before and during questioning when appointment of counsel was linked to a future point in time. The police advised the suspect:

> You have a right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.

*Duckworth*, 492 U.S. at 198 (emphasis omitted).

The Supreme Court rejected the defendant's argument that these warnings were defective because the warnings linked "the right to appointed counsel … [to a] future point in time *after* the police interrogation." *Id.* at 204 (alteration in original). The Court held that the warnings, considered in their totality, were sufficient to satisfy *Miranda*. *Id.* at 205.

Here, the *Miranda* advisement, including Detective Collins' response to Mitchell's question, was constitutionally adequate. Nothing in Detective Collins' response tempered or negated Mitchell's right to counsel before and during the interrogation, his right to refuse to answer questions, his right to stop questioning at any time, or his right to the appointment of counsel. Detective Collins' statement simply indicated *when* counsel would be appointed, but did not imply that the *right* to an attorney was tied to some future event. Considering this exchange under the totality of the circumstances, some courts may have concluded (as the Michigan Court of Appeals did) that Detective Collins' statement created sufficient ambiguity as to render the *Miranda* warnings inadequate, or at least to raise a question about the adequacy of the warnings. But other reasonable jurists could and did (the Michigan Supreme Court) conclude that the warnings were adequate. Under the AEDPA's deferential standard of review, the Court may not grant relief simply because it might have come to a different conclusion. Instead, because the Michigan Supreme Court's conclusion is in accord with Supreme Court precedent, this Court must deny habeas relief.

In sum, mindful that in reviewing the sufficiency of *Miranda* warnings, the question is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*. *See Florida v. Powell*, 559 U.S. 50, 60 (2010). The Court cannot conclude that the Michigan Supreme Court's determination of Mitchell's

claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

### 3. Mid-Stream *Miranda* Warning

Mitchell next claims that his statement should have been suppressed because Detective Collins engaged in a question first, warn later strategy. Mitchell argues that admitting his statement was an unreasonable application of *Missouri v. Seibert*, 542 U.S. 600 (2004) and *Oregon v. Elstad*, 470 U.S. 298 (1985). The Michigan Supreme Court found no violation because Mitchell denied involvement in the killing in his pre-*Miranda* statement and, consequently, there was no earlier confession for him to repeat. *Mitchell*, 822 N.W. 2d at 224.

In *Elstad*, the Supreme Court considered the admissibility of a confession made after a *Miranda* violation. The defendant was interrogated in his home without receiving his *Miranda* warnings and confessed to a crime. *Id*. at 300-01. He was then taken to the police station, and, after being given *Miranda* warnings, again confessed. *Id*. at 301. The trial court suppressed the first confession, but admitted the second. Defendant argued that the second confession should have been suppressed because it was the fruit of the first tainted confession. The Supreme Court held the second confession admissible because the first statement was voluntary and the second statement followed a knowing and voluntary waiver

of rights.  *Id.* at 315.  The Court reasoned that "a simple failure to administer the [*Miranda* ] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" will not automatically "taint[ ] the investigatory process" such that "a subsequent voluntary and informed waiver is ineffective for some indeterminate period."  *Id.* at 309.  "*Miranda* requires that [an] unwarned admission must be suppressed."  *Id.*  But "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary."  *Id.* at 318.  The admissibility of a post-*Miranda* statement "should turn . . . solely on whether it is knowingly and voluntarily made."  *Id.* at 309.  "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."  *Id.* at 318.  The appropriate inquiry is whether "the second statement was also voluntarily made."  *Id.*

The United States Supreme Court also examined a two-step interrogation process in *Missouri v. Seibert*, 542 U.S. 600, 616 (2004) (plurality opinion).  In *Seibert*, the Court held that suppression of pre- and post-*Miranda* statements was required where the defendant was *Mirandized* after her first confession.  *Id.* at 599. A plurality of the Supreme Court identified five factors to govern whether "midstream" *Miranda* warnings are effective to overcome the impact of prior,

unwarned interrogation: (1) "the completeness and detail of the questions and answers in the first round of interrogation"; (2) "the overlapping content of the two statements"; (3) "the timing and setting of the first and second" interrogation; (4) "the continuity of police personnel"; and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. The Sixth Circuit Court of Appeals has adopted this multi-factor test of the plurality as precedent in this Circuit. *United States v. Ray,* 803 F. 3d 244, 272-73 (6th Cir. 2015).[2]

The Supreme Court again considered mid-stream *Miranda* warnings in *Bobby v. Dixon*, 565 U.S. 23 (2011) (per curiam). In *Dixon,* Dixon and another man murdered the victim by beating him and then burying him alive. *Id.* at 24-25. Dixon then used the victim's social security card and birth certificate to obtain a state identification card in the victim's name to sell the victim's car. *Id.* at 25. The police arrested Dixon on a forgery charge and then questioned him intermittently over several hours for a total of about 45 minutes. *Id*. Police intentionally declined to provide Dixon with *Miranda* warnings because they did not want him to refuse to speak to them. *Id.* Dixon admitted to forging the victim's signature, but said that the victim had given him permission to sell the car. *Id.* Dixon denied

---

[2] In a concurring opinion, Justice Kennedy stated that *Elstad* should govern the admissibility of post-*Miranda* warnings unless officers deliberately employed a two-step interrogation technique designed to dilute or circumvent the *Miranda* warnings. *Seibert*, 542 U.S. at 622. If officers deliberately engaged in a two-step process, the post-*Miranda* warnings must be excluded absent curative measures. *Id.*

having any involvement in the victim's disappearance. *Id.* Several hours later, Dixon was again brought from the jail to the police station for questioning. Dixon told police he heard they had found a body and asked whether his co-defendant was in custody. *Id.* at 26. Upon learning that he was not, Dixon told police, "I talked to my attorney, and I want to tell you what happened." *Id.* After police advised him of his *Miranda* rights, Dixon admitted to murdering the victim. *Id.* The trial court excluded Dixon's confession to forgery and his confession to murder. *Id.* The Supreme Court reversed, holding that Dixon's murder confession was admissible. The Court found "no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings Dixon received." *Id.* at 31.

The Court explained:

> In *Seibert*, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before." 542 U.S. at 616-617, 124 S. Ct. 2601 (plurality opinion). But in this case Dixon steadfastly maintained during his first, unwarned interrogation that he had "[n]othing whatsoever" to do with Hammer's disappearance. . . . Thus, unlike in *Seibert*, there is no concern here that police gave Dixon *Miranda* warnings and then led him to repeat an earlier murder confession, because there was no earlier confession to repeat. Indeed, Dixon contradicted his prior unwarned statements when he confessed to [the] murder. Nor is there any evidence that police used Dixon's earlier admission to forgery to induce him to waive his right to silence later: Dixon declared his desire to tell police what happened to [the victim] before the second interrogation session even began. . . . [T]here was simply "no nexus"

between Dixon's unwarned admission to forgery and his later, warned confession to murder.

*Dixon*, 565 U.S. at 31.

Similarly, in this case, Mitchell maintained during his pre-*Miranda* interrogation that he had nothing to do with the victim's beating or death. The Michigan Supreme Court held that, accordingly, "there is no concern here that police gave [Mitchell] *Miranda* warnings then led him to repeat an earlier murder confession, because there was no earlier confession to repeat." *Mitchell*, 822 N.W. 2d at 224. Mitchell's first unwarned statement cannot reasonably have been perceived by Mitchell as letting "the cat out of the bag" such that he would feel "[t]he secret is out for good." *United States v. Bayer*, 331 U.S. 532, 540 (1947). As was the case in *Dixon*, Mitchell's post-warning confession to participating in the beating of the victim contradicted his prior unwarned statements. There is no indication that police used Mitchell's unwarned statement to induce him to waive his rights later or to undermine the *Miranda* warnings.

Mitchell fails to show that the interrogation procedures in this case were similar to the two-step interrogation procedure condemned by the Supreme Court. Accordingly, the state court's rejection of this claim is neither contrary to nor an unreasonable application of Supreme Court precedent.

## C.     Claim III: First-Degree Premeditated Murder Jury Instruction

Mitchell's third claim for habeas relief concerns the first-degree premeditated murder jury instruction.  He argues that the trial court improperly instructed the jury on the intent element of first-degree premeditated murder and allowed the jury to convict Mitchell if it found that his co-defendant committed the murder and the co-defendant acted with the intent to kill.  Respondent argues that this claim is waived and meritless.  The Court concludes that this claim lacks merit and, therefore, need not decide the State's procedural-default defense.  *See Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (per curiam) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (noting that "the procedural-bar issue [need not] invariably be resolved first" and that, if another basis for denial "were easily resolvable against the petitioner," the non-procedural basis may be invoked instead in order to avoid "complicated issues of state [procedural] law.")).

"It is a fundamental Constitutional law that no one may be convicted of a crime absent proof beyond a reasonable doubt of every fact necessary to constitute that crime." *Glenn v. Dallman*, 686 F. 2d 418, 420 (6th Cir. 1982).  To show that a jury instruction violates due process, a habeas petitioner must demonstrate "both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  *Waddington v.*

*Sarausad*, 555 U.S. 179, 190-91 (2009). A petitioner is entitled to habeas relief only if the defective jury instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). A federal court may not grant the writ of habeas corpus on the ground that a jury instruction was incorrect under state law, *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991), and "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). The jury instruction "must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72. A state court's finding that challenged jury instructions "adequately reflected the applicable state law and corresponding state charges" is binding on federal habeas review. *White v. Steele*, 629 F. App'x 690, 695 (6th Cir. 2015). "The exception is when the instruction is so flawed as a matter of state laws as to "'infect[] the entire trial' in such a way that the conviction violates federal due process." *Rashad v. Lafler*, 675 F. 3d 564, 569 (6th Cir. 2012) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

The Michigan Court of Appeals, although finding the claim waived, nevertheless ruled on the propriety of the first-degree premeditated murder instruction. The state court held that the instruction adequately conveyed the elements of first-degree premeditated murder and aiding and abetting first-degree

murder: "the jury was properly instructed that, to convict defendant of first-degree premeditated murder, it had to find that he either intended to kill the victim or that he assisted Brown with knowledge that Brown intended to kill the victim." *Mitchell*, 2013 WL 951192 at *4.

The trial court instructed the jury on the intent element of first-degree premeditated murder as follow: "Second, that the defendant's [sic] intended to kill Michael Jord[e]n, either one of them individually or both of them." (ECF 10-12 at Pg ID 1266.) That instruction, by itself, may have confused the jury as to whether Brown's intent to kill could satisfy this element as to Mitchell if Mitchell himself lacked an intent to kill. However, the instructions, considered as a whole, clearly conveyed the necessary intent. For example, the trial court instructed the jury: "You should consider each defendant separately." (*Id.* at Pg ID 1272.) The trial court also repeated the instructions for first degree murder as follows:

> The elements for first degree murder are again, victim's death, death caused by defendant, death not justified or excused or mitigated in some manner to make it a lesser offense.
>
> Defendant actually intended to kill the victim.
>
> Defendant premeditated victim's death.
>
> Defendant deliberated as to the victim's death. In other words that's the premeditation too.

(*Id.* at Pg ID 1268.)

An allegedly faulty instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Joseph v. Coyle*, 469 F. 3d 441, 464 (6th Cir. 2006) (quoting *Estelle*, 502 U.S. at 72). The court's jury instructions as to first-degree premeditated murder, when read in their entirety, properly required the jury to find Mitchell had a specific intent to kill. Thus, Petitioner is not entitled to habeas corpus relief with respect to this claim.

### D.   Claim IV:  Prosecutorial Misconduct Claim

Mitchell next argues that the prosecutor's misconduct violated his right to a fair trial. Specifically, he alleges the prosecutor committed misconduct by: (i) appealing to community sentiment against violent crime and the jury's sympathy for the victim and his family; (ii) referring to facts not in evidence; and (iii) attacking Mitchell's general character. The Court finds that the Michigan Court of Appeals' decision denying Mitchell's claims was not contrary to or an unreasonable application of Supreme Court precedent.

The "clearly established Federal law" relevant to a habeas court's review of a prosecutorial misconduct claim is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *Parker v. Matthews*, 567 U.S. 37, 45 (2012). In *Darden*, the Supreme Court held that a "prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial

with unfairness as to make the resulting conviction a denial of due process.'"

*Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  This Court must ask whether the Michigan Court of Appeals' decision denying Petitioner's prosecutorial misconduct claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Parker*, 567 U.S. at 47 (quoting *Harrington*, 562 U.S. at 103).

First, Mitchell argues that the prosecutor improperly appealed to the jury's sense of disgust with violent crime and to the jury's sympathy for the victim. Mitchell cites this portion of the prosecutor's closing argument:

> It took a little while.  But I equate time with life.  And Michael Jord[e]n's life was stolen from him.  The time on this earth was ended.  This individual, who must have known something, there must have been some foreshadowing in his mind that something might have him, married his wife in Ohio on her birthday, two days before his demise.  He did not know exactly what was going to happen. But he couldn't have believed that his wife would be made a widow by the same individual and his father who ate pancakes in his house made by his fiancée at the time.  There's a lot of things here.
>
> Let me continue with my thumbnail sketch, what has now turned into a mural.  And it probably would cover the side of this building.  Now let's start with Michael Jord[e]n.  Laying in the street, pants down below his knees with no underwear on.  I don't think he thought his time was to go on that day in that particular manner.  He's laying there in the street.  That's one picture.
>
> ***
>
> I want you to see his wife weeping about his demise.
>
> ***

> Ladies and gentlemen, after you heard the testimony of these two
> people, you felt like you were watching a dog chasing his tail. You
> don't know where it began, and where it's going to end. And I'm
> going to tell you, you don't have to feel that way. These widow
> makers, merry go round tale of what happened on that day, does not
> make sense.

(ECF No. 10-12 at Pg ID 1222-24.)

It is well established that prosecutors "must obey the cardinal rule that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Broom v. Mitchell*, 441 F. 3d 392, 412 (6th Cir. 2006). The Michigan Court of Appeals found no "improper appeal to community sentiment against violent crimes or civic-duty argument;" instead "the prosecutor was merely arguing the evidence of this violent crime by using passionate language, which is not improper." *Mitchell*, 2013 WL 951192, at \*5. But the Michigan Court of Appeals found that the prosecutor improperly appealed to the sympathies and emotions of the jurors when he characterized Mitchell and Brown as "widow makers" and asked the jurors to see Jorden's "wife weeping about his demise." *Id.* The court of appeals, nevertheless, found that, given the overwhelming evidence incriminating Mitchell in Jorden's murder, Mitchell was not prejudiced by the comments. *Id.* The Court agrees with the state court's assessment. The prosecutor clearly did not appeal to community conscience in his closing remarks. He did, however, use dramatic language as noted by the Michigan Court of Appeals. The Michigan Court of Appeals' conclusion that the prosecutor's comments were not

prejudicial is not unreasonable. The state court cautioned the jurors that they were not to let sympathy or prejudice influence their decision, the prosecutor's comments were relatively isolated, and the prosecutor did not ask the jury to convict on the basis of sympathy for the victim or the victim's wife. Petitioner has not shown that the state-court's rejection of this prosecutorial-misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 567 U.S. at 47. Therefore, the Court finds that the trial court's decision was not contrary to or an unreasonable application of Supreme Court precedent.

Second, Mitchell argues that the prosecutor improperly referenced facts not in evidence when he referenced how loud the gun would have sounded in the van, stated that an AK-47 is two to three feet long, and posited that Mitchell may have taken the van to the "crusher" after the crime to destroy evidence. (ECF No. 10-12 at Pg ID 1228-31.) The Michigan Court of Appeals held that the prosecutor's comments were proper because they involved "matters that the jurors could infer from their common knowledge and experiences." *Mitchell*, 2013 WL 951192, at *5. The prosecutor's arguments reasonably asked the jury to make common-sense inferences from the evidence – that a gun fired inside a van would be loud, an AK-47 is large, and that someone involved in a crime may have tried to dispose of

evidence. "A prosecutor does not rely on facts not in evidence by simply asking jurors to make common-sense inferences from the evidence." *United States v. Smith*, 89 F. App'x 494, 498 (6th Cir. 2004). Moreover, the prosecutor's statements, even if improper, were not so flagrant as to violate due process.

Finally, Mitchell argues that the prosecutor made improper personal attacks by referring to him as a "killer" and "psychopath." The Michigan Court of Appeals denied Mitchell's prosecutorial misconduct claims without specifically addressing this claim. The Court need not decide whether the state court denied this claim on the merits because, even under a *de novo* standard of review, this claim fails.

"[T]he use of colorful pejoratives is not improper," so long as the pejorative used is supported by the evidence. *United States v. Fields*, 483 F. 3d 313, 360-61 (5th Cir. 2007) (quoting *United States v. Shoff*, 151 F. 3d 889, 893 (8th Cir. 1998)); *accord United States v. Temple*, No. 93-6206, 1994 WL 201876, at *6 (6th Cir. May 20, 1994) (holding that prosecutor's pejorative description of defendant, by itself, did not constitute prosecutorial misconduct); *United States v. Wheeler*, 137 F. App'x 304, 310 (11th Cir. 2005) ("[U]nflattering characterizations of a defendant . . . do not require reversal if they are supported by the evidence") (internal quotation omitted); *Gonzalez v. Carey*, 58 F. App'x 269, 270 (9th Cir. 2003) (holding the prosecutor's references to the petitioner as a "thug" during

closing arguments was a reasonable inference based on the evidence presented at trial regarding the petitioner's alleged conduct in abducting, beating, and stabbing the victim); *James v. Bowersox*, 187 F. 3d 866, 870 (8th Cir. 1999) (denying habeas relief on a prosecutorial misconduct claim where prosecutor's opening argument referred to petitioner as "a big time, drug dealing, murdering, robbing slime").

The evidence supported the argument that Mitchell was a killer, no testimony, however, was presented to show that he was diagnosed as a psychopath. Nevertheless, the Court finds that the prosecutor's argument was not improper. The prosecutor referred to Mitchell as a psychopath to rebut defense counsel's reference to Mitchell as a child who had been abandoned by his father. (ECF No. 10-12 at Pg ID 1246.) The prosecutor noted that Mitchell admitted that, after the killing, he went to a nightclub to get some drinks, be around people, and listen to music. (*Id*.) The prosecutor argued that this behavior was that of a psychopath not a boy. (*Id*.) Merriam-Webster defines a psychopath as "a person who is mentally ill or unstable." *Random House College Dictionary* 1068 (Rev'd ed. 1982). One could reasonably infer from the evidence presented that Mitchell was an unstable person. The prosecutor's comment, therefore, was not improper.

### E. Claim V: Ineffective Assistance of Trial Counsel

Mitchell's fifth claim raises several ineffective assistance of counsel claims. He argues that counsel was ineffective in failing to (i) request an evidentiary hearing regarding the admissibility of his custodial statement; (ii) object to prosecutorial misconduct; and (iii) object to an instructional error.

The AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, — U.S. — , 134 S. Ct. 10, 16 (2013). The standard for obtaining relief is "'difficult to meet.'" *White v. Woodall*, — U.S. —, 134 S. Ct. 1697, 1702 (2014) (quoting *Metrish v. Lancaster*, 569 U.S. —, —, 133 S. Ct. 1781, 1786 (2013)). In the context of an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984), the standard is "all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly so.'" *Harrington*, 562 U.S. at 105 (internal citations omitted). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687. To establish deficient

representation, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id*. at 688. In order to establish prejudice, a petitioner must show that, but for the constitutionally deficient representation, there is a "reasonable probability" that the outcome of the proceeding would have been different. *Id.* at 694.

First, Mitchell argues that counsel was ineffective in failing to request an evidentiary hearing regarding whether his custodial statement was the fruit of an unlawful pre-*Miranda* interrogation. The Michigan Supreme Court reversed the Michigan Court of Appeals' decision remanding to the trial court for an evidentiary hearing on the circumstances of the interrogation because the record showed that the taped confession was not the fruit of a prior unwarned confession. *Mitchell*, 822 N.W. 2d at 224. On remand to address the remaining claims, the Michigan Court of Appeals found that counsel was not ineffective in failing to seek an evidentiary hearing because the Michigan Supreme Court held that the record was sufficient for a finding that the confession was properly admitted. *Mitchell*, 2013 WL 951192, at *6. As discussed, Mitchell has not shown that the Michigan Supreme Court's determination that his confession was properly admitted is contrary to or an unreasonable application of Supreme Court precedent. Therefore, even assuming that counsel was deficient in failing to request an evidentiary

hearing on this issue, Mitchell cannot establish that he was prejudiced by counsel's failure because the confession was admissible.

Next, Mitchell argues that counsel was ineffective in failing to object to the prosecutor's misconduct. But as discussed above, Mitchell has failed to show that the prosecutor engaged in misconduct. This is so even with respect to Mitchell's claim that counsel improperly appealed to the sympathies and emotions of the jurors during closing argument. For the same reasons that the state court found no prejudice from this improper argument, Mitchell cannot establish prejudice from counsel's failure to object. Therefore, counsel was not ineffective in failing to object to the prosecutor's comments.

Finally, Mitchell argues that trial counsel was ineffective in failing to object to the jury instructions regarding first-degree premeditated murder. Because the Michigan Court of Appeals concluded that the trial court's jury instructions were correct, defense counsel was not ineffective for failing to object to the instructions. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F. 3d 741, 752 (6th Cir. 2013). Mitchell is not entitled to habeas relief on these ineffective assistance of trial counsel claims.

## F.    Claim VI:  Cumulative Effect of Alleged Errors

Mitchell argues that the cumulative effect of the errors alleged in his petition violated his right to a fair trial. On habeas review, a claim that the cumulative

effect of errors rendered a petitioner's trial fundamentally unfair is not cognizable. *Sheppard v. Bagley*, 657 F. 3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F. 3d 250, 256 (6th Cir. 2005)). Therefore, Petitioner is not entitled to relief on this claim.

### G.     Claim VII:  Constitutionality of AEDPA's Standard of Review

Finally, Mitchell argues that the standard of review set forth in 28 U.S.C. § 2254(d)(1) and applied by the Court to the claims raised in Mitchell's petition, is unconstitutional.  Mitchell argues that the standard of review violates the doctrine of separation of powers, the Supremacy Clause, and the Due Process Clause, improperly requires federal courts to issue advisory opinions, and is so strict as to effectively suspend the writ of habeas corpus.

First, Mitchell argues that § 2254(d)(1) violates the separation of powers.  In support of this contention, he cites *Marbury v. Madison*, 5 U.S. 137, 177 (1803), in which the Supreme Court stated: "[i]t is emphatically the province and duty of the judicial department to say what the law is."  Mitchell argues that the § 2254(d)(1) standard violates this principle because it requires federal courts to ignore binding circuit precedent and look only to the Supreme Court's determination of federal law, thereby prohibiting application of the normal rules of *stare decisis*.  The Sixth Circuit Court of Appeals has not specifically addressed this issue, but those circuit courts that have addressed the issue have found that § 2254(d) does not violate the

doctrine of separation of powers.  For example, the Fourth Circuit Court of

Appeals has held:

> In amending section 2254(d)(1), Congress has simply adopted a choice of law rule that prospectively governs classes of habeas cases; it has not subjected final judgments to revision, nor has it dictated the judiciary's interpretation of governing law and mandated a particular result in any pending case.  And amended section 2254(d) does not limit any inferior federal court's independent interpretive authority to determine the meaning of federal law in any Article III case or controversy.  Under the AEDPA, we are free, if we choose, to decide whether a habeas petitioner's conviction and sentence violate any constitutional rights.  Section 2254(d) only places an additional restriction upon the scope of the habeas remedy in certain circumstances.

*Green v. French*, 143 F. 3d 865, 874-75 (4th Cir. 1998) (internal citations omitted)*,

abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000); *see also

Cobb v. Thaler*, 682 F. 3d 364, 374 (5th Cir. 2012) ("As each circuit to address the

question has recognized, § 2254(d)(1) does not intrude on the independent

adjudicative authority of the federal courts. Rather, it limits the grounds on which

federal courts may grant the habeas remedy to upset a state conviction.");

*Bonomelli v. Dinwiddie*, 399 F. App'x 384, 387 (10th Cir. 2010) (affirming the

district court's rejection of petitioner's argument that the AEDPA violates the

Constitution's separation of powers doctrine);  *Evans v. Thompson,* 518 F. 3d 1, 11

(1st Cir. 2008) ("while AEDPA does restrict a remedy, it does not interfere with

Article III powers"); *Crater v. Galaza*, 491 F. 3d 1119, 1127 (9th Cir. 2007)

(finding that § 2254(d)(1) does not violate the separation of powers doctrine);

*Lindh v. Murphy*, 96 F. 3d 856, 868-69 (7th Cir. 1996) (en banc) (holding that the language of the AEDPA "preserves rather than undermines federal courts' independent interpretive power"), *rev'd on other grounds*, 521 U.S. 320 (1997). The Court finds persuasive the decisions of these circuit courts and likewise denies Mitchell's claim that § 2254(d)(1) violates the separation of powers.

Second, Mitchell claims that § 2254(d)(1)'s standard violates the Supremacy Clause "by preventing federal courts from denying effect to an entire class of state court decisions that conflict with federal law – *i.e.* that class of cases in which the state court decision is wrong as a matter of federal constitutional law, but not unreasonably wrong." (ECF No. 1 at Pg ID 78-79.) "The Supremacy Clause makes [federal] laws 'the supreme Law of the Land,' and charges state courts with a coordinate responsibility to enforce that law according to their regular modes of procedure." *Howlett v. Rose,* 496 U.S. 356, 367 (1990). Thus, the laws of the United States are "supreme" and the "law of the State ... must yield to it." *Gibbons v. Ogden*, 22 U.S. 1, 211 (1824). The AEDPA does not alter or undermine this rule of law. While it requires federal courts to give considerable deference to state courts' decisions on federal constitutional issues, it does not subjugate the Constitution to state law.

Next, Mitchell argues that § 2254(d)(1) requires a federal court to issue advisory opinions, because where a state court wrongly, but not unreasonably,

applies constitutional law, no relief may be afforded under AEDPA. It is well-established that "'[t]he exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy,' and 'a federal court [lacks] the power to render advisory opinions.'" *United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am.*, 508 U.S. 439, 446 (1993) (alterations in original) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)). While a finding that a state court's decision was simply incorrect and not unreasonable precludes habeas relief, this does not render a federal court's decision advisory. *See Byrd v. Trombley*, 580 F. Supp. 2d 542, 553 (E.D. Mich. 2008) ("[A]ny determination of the merits of the underlying constitutional claim as part of the reasonableness inquiry under § 2254(d)(1) does not amount to an advisory opinion.").

Fourth, Mitchell claims that the AEDPA's standard of review violates the Due Process Clause of the Fourteenth Amendment by preventing a federal court from remedying due process violations when the state has incorrectly, but not unreasonably, applied constitutional law. Section 2254(d)(1)'s standard of review does not deny a petitioner "a forum for the vindication of his constitutional rights. The Court still has the power to issue the writ, albeit under more tightly circumscribed conditions." *Id.* Given that the Supreme Court recognizes that "judgments about the proper scope of the writ are 'normally for Congress to make,'" Mitchell has not shown that the strict standard under which habeas corpus

petitions are reviewed was an unconstitutional limit on the power to grant the writ. *Felker v. Turpin*, 518 U.S. 651, 664 (1996) (quoting *Lonchar v. Thomas*, 517 U.S. 314, 323 (1996)).

Finally, Mitchell argues that AEDPA's standard of review amounts to an unconstitutional suspension of the writ of habeas corpus. The Suspension Clause states: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. In *Harrington v. Richter*, the Supreme Court held that § 2254(d) does not completely bar federal court relitigation of claims rejected in state proceedings because "[i]t preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedent." 562 U.S. at 102. Although the standard "is difficult to meet," it is not impossible and therefore does not amount to a suspension of the writ. *See Crater*, 491 F. 3d at 1125 ("Section 2254(d)(1) simply modifies the preconditions for habeas relief, and does not remove all habeas jurisdiction."); *Lindh,* 96 F. 3d at 867 ("[T]o alter the standards on which writs issue is not to 'suspend' the privilege of the writ.").

## IV.    Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition.

Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]"
*Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To receive a certificate of appealability, "a petitioner must sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336.

The Court finds that reasonable jurists could debate the Court's assessment of Petitioner's first and second claims regarding the admissibility of Mitchell's custodial statement. Consequently, a certificate of appealability will be granted on those claims.

Reasonable jurists would not find the Court's assessment of Petitioner's remaining claims to be debatable or wrong. The Court therefore declines to issue a certificate of appealability on claims three through seven.

## V.    Order

For the reasons given above,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **GRANTED** as to claims one and two and **DENIED** as to the remaining claims.

**IT IS FURTHER ORDERED** that Petitioner may proceed *in forma pauperis* on appeal for claims one and two because an appeal may be taken in good faith.  28 U.S.C. § 1915(a)(3).

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: October 25, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, October 25, 2017, by electronic and/or U.S. First Class mail.

s/ R. Loury
Case Manager